IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| ABDUL LOVE,<br><br>    **Plaintiff,**<br><br>v.<br><br>PERCY MYERS, LARUE LOVE,<br>CHRISTOPHER THOMPSON,<br>CHRISTINE BROWN, ROB JEFFREYS,<br>and WEXFORD HEALTH SOURCES,<br><br>    **Defendants.** | Case No. 18-cv-2000-NJR |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

  Plaintiff Abdul Love, an inmate of the Illinois Department of Corrections ("IDOC") who at all times relevant to this case was incarcerated at Pinckneyville Correctional Center ("Pinckneyville"), seeks monetary damages and injunctive relief for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983. In the Complaint, Love alleges that Defendants Percy Myers, Christine Brown, Larue Love, Christopher Thompson, and Wexford Health Sources, Inc. (hereinafter "Wexford") were deliberately indifferent in treating his Crohn's disease; he asserts claims against them under the Eighth Amendment.

  The case is now before the Court on summary judgment motions filed by Percy Myers and Wexford (Docs. 128, 129) and Christine Brown, Rob Jeffreys, Larue Love, and Christopher Thompson (Docs. 140, 141, 143). Love filed responses to the motions (Docs. 135, 136, 137, 144, respectively).

**FACTUAL AND PROCEDURAL BACKGROUND**

  On October 19, 2018, Love filed his Complaint alleging deliberate indifference in the

treatment of his Crohn's disease (Docs. 1 and 8). He later amended his Complaint to add additional defendants (Doc. 64). Two claims were allowed to proceed:

> **Count 1:** **Eighth Amendment deliberate indifference claim against Dr. Percy Myers, Larue Love, Christopher Thompson (in his individual and official capacities) and Christine Brown for failing to adequately treat Love's Crohn's disease.**
>
> **Count 2:** **Eighth Amendment deliberate indifference claim against Wexford Health Sources, Inc. for hiring underqualified physicians.**

(Doc. 63, pp. 3-4; Doc. 64).

Love was also allowed to proceed against both Christopher Thompson, in his official capacity as warden of Pinckneyville, and John Baldwin, in his official capacity as IDOC Director, for purposes of implementing any injunctive relief awarded in the case (Doc. 8, p. 6; Doc. 63, p. 4). Both individuals are no longer employed at IDOC. On August 17, 2020, Rob Jeffreys (in his official capacity only) was substituted in place of John Baldwin (Doc. 122, p. 1 n. 1). Because Christopher Thompson is no longer the warden of Pinckneyville and Jeffreys has the authority to ensure Love receives any medical care awarded in this case, the official capacity claim against Christopher Thompson is **DISMISSED** (Doc. 141, p. 1 n. 1).

A. **Medical Care**

On May 18, 2018, Love transferred to Pinckneyville (Doc. 129-1, p. 6). He was first diagnosed with Crohn's disease (hereinafter "Crohn's") in 2010 while at Menard Correctional Center (*Id*. at p. 15). According to Dr. Percy Myers, Crohn's is an inflammatory bowel disease which currently has no cure (Doc. 129-2, p. 1). Patients with the disease are prescribed pain and symptom management plans to reduce flare-ups and keep the condition in remission (*Id*.). Love acknowledged that, because of his disease, he would experience times where he

would have symptoms and that some medications may work at times and sometimes those medications will not work (Doc. 129-1, p. 41).

Love previously saw a gastroenterologist prior to his transfer to Pinckneyville. In July 2017, he saw Dr. John Bozdech at Sarah D. Culbertson Hospital in Rushville, Illinois (Docs. 129-1, p. 16; 129-2, p. 1-2). At that time, Dr. Bozdech noted his last colonoscopy on April 21, 2017, showed a short segment of active colitis (Doc. 129-3, p. 53). Love was previously placed on mesalamine enemas, and Dr. Bozdech noted that he continued on mesalamine and budesonide with no symptoms (*Id.*). Dr. Bozdech's plan in the event of a future flare-up was to continue with mesalamine enemas (*Id.*). If the treatment was not effective, Dr. Bozdech noted that Love "may" need to be prescribed "something like azathioprine" (with the brand name of Imuran), an oral immunosuppressant (*Id.*; Doc. 129-1, p. 16). Dr. Myers testified in his affidavit that a typical mesalamine enema course lasts 4-5 weeks (Doc. 129-2, p. 2).

While at Danville Correctional Center, Love began experiencing flare-ups (Doc. 129-1, p. 16, 27). Love testified that he started another round of mesalamine enemas and budesonide and it worked well (*Id.* at p. 27). In December 2017 or January 2018, the enemas were discontinued, and he continued on the budesonide to keep his Crohn's in remission (*Id.*). On just the budesonide, Love testified that his symptoms began to reappear (*Id.* at p. 28). He began discussing with the medical director about implementing the immunosuppressant therapy Dr. Bozdech previously discussed, but after his blood work came back within normal parameters, the medical director decided not to start the Imuran (*Id.* at pp. 16, 28). To combat his continuing symptoms of blood, constipation, cramps, and diarrhea, in March or April 2018, Love was again prescribed mesalamine enemas and prednisone, an oral steroid (*Id.* at

pp. 28-29; Doc. 129-3, p. 54). The prescription for the melamine enemas was for eight weeks (Doc. 129-3, p. 54). Prior to his transfer to Pinckneyville, Love testified that the regimen was not helping his Crohn's symptoms (*Id*. at p. 29).

Upon transferring to Pinckneyville, he met with Dr. Myers in June 2018 and informed him that prior rounds of the mesalamine enemas had not worked, and Dr. Bozdech's recommendation was to order a stronger immunosuppressant (*Id*. at p. 17). At the time, Love was still experiencing symptoms including bloody stool, painful cramps, episodes of diarrhea and constipation, as well as fecal incontinence (*Id*.). He explained his prior treatment history as well as his current condition (*Id*. at pp. 17-18, 29). Love testified that Dr. Myers wanted to continue with the mesalamine enemas until he could send Love to a specialist (*Id*. at p. 18).

From June until August 2018, Love experienced increasing symptoms. He testified to 14 or 15 bloody bowel movements a day as well as stomach cramps, bouts of constipation and/or diarrhea, and rectal burning (Doc. 129-1, p. 30). Love reported his increasing symptoms to Dr. Myers and his belief that his Crohn's was becoming uncontrolled (Doc. 129-2, p. 2). Dr. Myers referred Love to collegial review for a follow-up with a gastroenterologist (*Id*.). On August 23 and 25, 2018, Love refused his daily enemas (Doc. 129-3, pp. 64, 66).

On August 28, 2017, Love reported 15-20 bloody stools a day; the nurse practitioner ordered labs which would show evidence of his flare-ups, including decreased hemoglobin and hematocrit (Doc. 129-2, p. 2). According to Dr. Myers, a patient experiencing a flare-up would see a rise in the white blood cell count, sedimentation rate, and C-Reactive Protein numbers due to the triggered inflammatory process (*Id*.). But Love's labs were all normal (*Id*.; Doc. 129-3, p. 61-63).

As a result of the normal tests, Love was placed in the infirmary to monitor his symptoms (Doc. 129-2, p. 2; Doc. 129-1, p. 31). His bowel movements were monitored by nursing staff (*Id.*; Doc. 129-1, pp. 32-33). Love testified that he did not believe the tests were accurate as nurses sometimes would not come back to check on his movements for up to an hour, and the blood would dissipate (Doc. 129-1, p. 33). He also believed that he should have been allowed to use a bedpan instead of the toilet to document his movements (*Id.* at p. 33, 46). Love testified that he believed some of the nurses did not properly document his movements or show up at all when he called (*Id.* at p. 35). Dr. Myers testified that no more than two bowel movements per day with very minimal blood were documented during Love's stay in the infirmary (Doc. 129-2, p. 3). Nursing staff also reported that Love flushed his mesalamine enemas rather than taking them as directed (*Id.*; Doc. 129-3, pp. 2-24). Love denies that he flushed the enemas (*See* Doc. 137, p. 13; Doc. 129-1, p. 37-39). He testified that nursing staff saw him taking the enemas and observed multiple bloody bowel movements a day (Doc. 129-1, p. 40).

Based on Love's lab results and the nurses' observations, Dr. Myers determined that he had no verification of Love's symptoms and no indicated need for a review by a gastroenterologist (Doc. 129-2, p. 3). He informed Love he needed to be compliant with his daily mesalamine enemas (*Id.*).

Love next reported a flare-up with his Crohn's on January 11, 2019 (Doc. 129-2, p. 3). He reported four to five bloody stools a day (*Id.*). Dr. Myers again admitted Love to the infirmary for monitoring (*Id.*; Doc. 129-3, pp. 35-36). Dr. Myers testified that Love was not compliant with his daily enemas and declared a hunger strike for several days (Doc. 129-2, p. 3; Doc. 129-3, pp. 37-42). Love started complying with the treatment plan on January 18,

2019, and he remained in the infirmary for observation until February 15, 2019 (Doc. 129-2, p. 3; Doc. 129-3, pp. 41-44). Dr. Myers testified that Love did not have four to five bowel movements per day, and his blood tests were normal. Once Love was compliant, Dr. Myers testified that there was minimal blood in his stool, and Love reported that he felt better (Doc.  129-2, p. 3; 129-3, p. 42).

On February 15, 2019, Love was released from the infirmary and prescribed prednisone, a steroid, with the daily mesalamine enemas (Doc. 129-2, p. 3; 129-3, p. 44). Dr. Myers testified he made the determination to prescribe prednisone based on past successes Love had with the drug and the American Academy of Gastroenterologists recommendation of its use to address the type of Crohn's that Love has been diagnosed with (*Id.* at pp. 3-4; Doc. 129-3, pp. 44-45). Love refused the medication (*Id.* at p. 4; Doc. 129-1, p. 44). Love testified that he took prednisone five years prior; it did not work and also caused him to gain fifty to sixty pounds (Doc. 129-1, p. 45). Love admitted that he refused the medication (*Id.*). He did not believe that the mesalamine enemas and prednisone were working (*Id.* at p. 47). In March 2019, Love was prescribed Fiberlax tabs but he refused to take the medication (Doc. 129-3, p. 25). In April 2019, Love indicated he did not want prednisone or another medication because it would not work (Doc. 129-3, pp. 27-28). Love requested to take Imurin, the brand name for azathioprine, which was recommended by Dr. Bozdech if the enemas were not successful (*Id.* at p. 29; 129-2, p. 4). Dr. Myers prescribed Imuran for Love, which he is currently taking (*Id.*; Doc. 129-1, p. 45).

### B. IDOC Defendants

As to the IDOC Defendants, Larue Love was Assistant Warden of Operations and was not over the healthcare unit (Doc. 141-2, p. 1). Love testified that he wrote letters to Warden

Love about his healthcare (Doc. 129-1, p. 68). He also testified that he spoke with Warden Love about his healthcare needs (*Id.* at p. 69).

Love wrote a letter to Warden Love on June 17, 2018, which indicated that due to his transfer he was unable to take care of himself (Doc. 1-1, p. 4). Warden Love responded asking for clarification as to why Love was unable to care for himself and questioned whether he had been seen by the healthcare unit (*Id.*). Love acknowledged that the response indicated Warden Love was not familiar with Crohn's and was not a medical professional (Doc. 129-1, p. 78). He also acknowledged that Warden Love's position was not responsible for providing medical treatment (*Id.*). Love further testified that he believed as Assistant Warden, Warden Love was in charge of the healthcare unit and had the power to direct Dr. Myers in providing treatment (*Id.* at pp. 78-83). He also believed Warden Love was Dr. Myers's immediate supervisor (*Id.* at p. 85). Warden Love testified that he was not a medical professional, could not order medical care, and relied on the medical staff's medical judgment (Doc. 141-2, p. 1).

In addition to responding to Love's letter, Warden Love also reviewed a grievance date July 30, 2018 (Doc. 141-2, p. 2; 141-4, pp. 1-2; 141-5, pp. 22-23). The grievance was deemed an emergency grievance and expedited for review (*Id.*). In reviewing the grievance, the grievance officer contacted Christine Brown about the treatment of Love's Crohn's (Doc. 141-4, pp. 1-2). Brown responded that Love was being treating according to the specialist's recommendations (*Id.*). She also noted in her response that he was scheduled for a follow-up with the doctor (*Id.*). During the relevant time period, Brown was the Healthcare Unit Administrator (Doc. 141-3, p. 1). Although a registered nurse, Brown does not provide medical care to inmates (*Id.;* Doc. 129, pp. 90-91).

Love testified that he wrote a letter to Brown about his healthcare on October 5, 2018

(Doc. 129-1, pp. 89-90; Doc. 1-1, p. 26). Love did not receive a response to his letter (*Id.* at p. 93). Brown does not recall receiving a letter from Love (Doc. 141-3, p. 1). Brown did respond to a number of grievances from Love about his medical care (Docs. 129-1, p. 93; 141-4; 141-5). She reviewed Love's medical records and responded with appointment dates and notes from the records (Doc. 141-3, p. 1).

Christopher Thompson was the Clinical Services Supervisor at Pinckneyville from January 2017 to April 2017, Assistant Warden of Programs from April 2017 to June 2018, and Acting Warden from June 2018 to February 2020 (Doc. 143). During the relevant time period, Love believed he was the acting warden (Doc. 129-1, p. 71). Love testified that he wrote a letter to Thompson in June 2018 about his medical condition and had a face-to-face conversation in July 2018 (*Id.*). Love's cumulative counseling summary indicated that on July 16, 2018, Thompson received a request about Love's condition (Doc. 144, p. 93). Thompson informed Love that his condition was being treated by the medical staff (*Id.*). In November 2018, Love testified he spoke to Thompson in the cafeteria about his medical condition (Doc. 129-1, p. 89). Thompson inquired about his Crohn's and Love responded, "it is what it is." (*Id.*). Thompson also reviewed a number of Love's grievances and expedited them as emergencies (Docs. 143, p. 1; 141-5).

**LEGAL STANDARDS**

**A. Summary Judgment Standard**

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014), citing Fed. R. Civ. P. 56(a). *Accord*

*Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012). A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). *Accord Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 681-82 (7th Cir. 2014).

In assessing a summary judgment motion, a district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Anderson*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, 756 F.3d 542 (7th Cir. 2014).

**B.** Deliberate Indifference

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks omitted)). *Accord Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009) ("[D]eliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution."). A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm — not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, 658 F.3d 742, 750 (7th Cir. 2011) (citing *Johnson v. Snyder*, 444 F.3d 579, 584 (7th Cir. 2006)). The first prong that must

be satisfied is whether the prisoner has shown he has an objectively serious medical need. *Arnett*, 658 F.3d at 750. *Accord Greeno*, 414 F.3d at 653. A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010). *Accord Farmer v. Brennan*, 511 U.S. 825, 836 (1994) (violating the Eighth Amendment requires "deliberate indifference to a substantial risk of serious harm.") (internal quotation marks omitted).

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Greeno*, 414 F.3d at 653. A plaintiff need not show the individual literally ignored his complaint, just that the individual was aware of the serious medical condition and either intentionally or recklessly disregarded it. *Hayes v. Snyder*, 546 F.3d 516, 524 (7th Cir. 2008).

## ANALYSIS

### A. Dr. Myers

Love argues that Dr. Myers was deliberately indifferent in treating his Crohn's by continuing with mesalamine enemas, delaying prescribing Imuran, and cancelling a follow-up appointment with a gastroenterologist. Simply put, there are genuine issues of material fact as to whether Dr. Myers was deliberately indifferent in treating Love's Crohn's disease. Although Dr. Myers argues that he referred Love to collegial review for a gastroenterologist consult, the medical records indicate he was approved for the consult and then Dr. Myers cancelled the follow-up. Dr. Myers testified that he did this, in part, because nursing staff documented lesser bowel movements during Love's infirmary stay than what Love had previously complained about, and because Love was not compliant with the enemas

(Doc. 129-2, p. 3; Doc. 137, p. 80-81). But Love testified that his bowel movements were not properly documented, and he denied that he was not compliant with the treatment (Doc. 129-1, pp. 37-40). If a jury finds that Love was compliant with his treatment plan yet had continued symptoms, then Dr. Myers's decision to cancel the appointment with the specialist could amount to deliberate indifference.

Further, Dr. Myers testified that a course of mesalamine enemas was typically 4-5 weeks and that Dr. Bozdech's recommendation called for Love to take mesalamine enemas first and then a different medication if the enemas did not put him into remission (Doc. 129-2, p. 2; 129-3, p. 53). But Dr. Myers initially prescribed the enemas for Love for six months (Doc. 129-3, p. 60). Love also testified that he had already taken a course of mesalamine enemas at Danville and the regimen was not controlling his Crohn's. Love continued with the enemas. He was not prescribed Imuran until April 19, 2019. This delay in prescribing Imuran and the continued treatment of Love's Crohn's with enemas, if found to be ineffective in treating his Crohn's, could amount to deliberate indifference. *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (delay in treatment may constitute deliberate indifference if it "exacerbated the injury or unnecessarily prolonged an inmate's pain"); *Greeno*, 414 F.3d 655 (continuing with treatment known to be ineffective violates the Eighth Amendment). As such, the Court finds that Dr. Myers is not entitled to summary judgment.

**B. Wexford Health Sources, Inc.**

As to Love's claims against Wexford, his Complaint alleged that Wexford had a policy of hiring unqualified physicians. Wexford, a private medical corporation acting under color of state law, is treated like a municipal entity and may only be held liable under Section 1983 for constitutional violations caused by its own policies or customs. *Whiting v. Wexford Health*

*Sources, Inc.*, 839 F.3d 658, 664 (7th Cir. 2016). In order for Wexford to be liable for the treatment of Love's Crohn's, Love must establish a "policy or custom" by pointing to: (1) an express policy that, when enforced, caused a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express policy, is so permanent and well-settled as to amount to a custom or usage that has the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority. *See Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 568 (7th Cir. 2021); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91 (1978); *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 379 (7th Cir. 2017) (*en banc*); *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 796 (7th Cir. 2014).

Although Love argues that Wexford hires unqualified or underqualified doctors, he offers no evidence to support his claims. He merely offers his own belief and opinions based on his prior experience and prior cases he has brought against Wexford doctors. But although he alleges he has successfully brought four previous cases against Wexford doctors, he doesn't point to those cases or their results.[1] The mere fact that Love filed a complaint regarding his medical care does not make it successful, nor does it evidence that a doctor employed by Wexford was unqualified or underqualified. Dr. Myers is a qualified medical professional. He graduated from medical school and is currently licensed to practice medicine in Illinois (Doc. 129-2, p. 1). Joe Ebbitt, the Director of Risk Management, HIPAA Compliance, and Legal Affairs for Wexford testified that the company only hires physicians "who have received medical appropriate training and are licensed to practice medicine." (Doc. 129-4, p. 2). Love fails to offer any evidence suggesting that Dr. Myers or any other

---

[1] Love has filed one other case in this district, *Love v. Godinez, et al.*, Case No. 12-cv-117-GPM, which was dismissed at screening (*See* Doc. 24).

employee of Wexford is not a qualified medical doctor.

To support his claim, Love also points to a document entitled "Staff Position Requirements and Job Descriptions."[2] The staff requirements document states that an on-site medical director shall be licensed in the State of Illinois to practice medicine, have a current DEA number, and be CPR certified (Doc. 136, p. 46). Love does not dispute that Dr. Myers meets those qualifications. Instead, Love argues that the requirements are generic and because the document states licensed to "practice medicine," that a veterinarian could hold the position. Love fails to point to any veterinarians that are currently employed as medical directors for Wexford, and Love's characterization of the document is unfounded and not supported by the evidence. The requirements for medical director clearly state that the individual be a licensed medical doctor (not a veterinarian) and one, preferably, with family or internal medicine experience, completion of a residency training program, and board certified or eligible (*Id.*). Love fails to point to any evidence suggesting that Wexford has a policy or practice of hiring unqualified or underqualified doctors. Thus, Wexford is entitled to summary judgment.

## C. IDOC Defendants

Defendants Brown, Thompson, and Warden Love argue that they are entitled to summary judgment because they were not personally involved in Love's care, and they did not act with deliberate indifference towards his need for medical care. Love argues that these defendants turned a blind eye to his written requests and grievances. But none of these

---

[2] It is not clear what document this Job Descriptions page, labeled Exhibit III to another document, was originally attached to; Love merely states that he received it in discovery. It appears to be an Exhibit to Wexford's contract with IDOC which Love attaches to one of his other responsive documents (*See* Doc. 137, pp. 27-63).

defendants provided Love with medical care, nor were any of them in a supervisory position to direct the medical care provided by Dr. Myers (Docs. 141-2, 141-3, and 143).

Love makes much of the fact that Defendants reviewed his grievances but didn't exercise their authority to obtain additional medical care for him. He relies heavily on the Seventh Circuit's decision in *Perez v. Fenoglio*, 792 F.3d 768 (7th Cir. 2015). In that case, the Seventh Circuit has held that "[a]n inmate's correspondence to a prison administrator may…establish a basis for personal liability under [Section] 1983 where that correspondence provides sufficient knowledge of a constitutional deprivation" and the official then refuses to "exercise the authority of his or her office" to address the issue. *Perez*, 792 F.3d at 781-82 (internal quotations omitted) (citing *Vance v. Peters*, 97 F.3d 987, 992-93 (7th Cir. 1996)). But in *Perez*, the Seventh Circuit was analyzing the district court's *screening* of the inmate's complaint, noting that discovery would shed light on whether the officials took actions to investigate the grievances and reasonably relied on medical professionals' judgment. *Id*. at 782.

At this stage, there is no evidence to suggest that Defendants were deliberately indifferent to Love's medical needs. As to Thompson and Warden Love, they reviewed and responded to his grievances. Warden Love also responded to Love's correspondence with additional questions about his care (Doc. 1-1, p. 4). Similarly, Thompson responded to a request regarding Love's medical condition by advising him that he was being treated by healthcare staff (Doc. 144, p. 93). They did not ignore his complaints about his medical care but instead reviewed the claims and responded to his concerns.

Love argues that none of the IDOC Defendants exercised authority, investigated his claims, or ensured he was provided with adequate medical care in response to his grievances.

He points to a grievance dated September 28, 2018, which he alleges provided ample information about the inadequacies of the care being provided, and he did not receive the response he wanted from the grievance. But the grievance was expedited by Thompson as an emergency (Doc. 141-5, pp. 12-14). Further, the grievance was reviewed and denied because Love was being treated by the healthcare staff (*Id*. at p. 11). Other grievances regarding Love's care were also expedited as emergencies by both Thompson and Warden Love, and his medical care was reviewed (Doc. 141-5, pp. 1-6, 16-23).[3] Although the grievances were ultimately denied, the denial of a grievance by individuals who did not participate in the underlying conduct does not amount to deliberate indifference. *See Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011) ("[T]he alleged mishandling of [a prisoner's] grievance by persons who otherwise did not cause or participate in the underlying conduct states no claim."); *George v. Smith*, 507 F.3d 605, 609-10 (7th Cir. 2007) ("a guard who rejects an administrative complaint about a completed act of misconduct does not" violate the Constitution).

Further, as non-medical officials, they were allowed to defer to the judgment of medical professionals regarding Love's treatment. *See Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019). The Seventh Circuit has held that if an inmate is under the care of medical personnel, "non-medical prison official[s] [are generally] justified in believing the prisoner is in capable hands." *Id*. (quoting *Greeno*, 414 F.3d at 656). *See also Hayes*, 546 F.3d at 526-28. The grievance responses indicate that officials inquired into the care he was receiving (Doc. 141-5, pp. 4, 11, 16, 21). The responses indicate that he was receiving care according to the

---

[3] Although Love's July 30, 2018 grievance was marked by S. Thompson as an emergency, Warden Love testified that he expedited the grievance when he was covering for Thompson (Doc. 141-2, p. 2).

specialist's plan and he was non-compliant with the treatment plan (*Id.*). Although Love disputes that he was non-compliant, nothing in the response hinted that the specialist's plan was not being followed, and the non-medical officials were allowed to rely on the judgment of the medical professionals and not investigate further than the records. *Hayes*, 546 F.3d at 527-28 (non-medical officials who relied on medical official's judgment and did not investigate further than the medical records were not deliberately indifferent nor had an obligation to investigate further than the records). Because Defendants Warden Love and Thompson responded to Love's grievances and letters and referred him to medical staff, there is no evidence that they acted with deliberate indifference to his medical needs.

Similarly, there is no evidence that Brown acted with deliberate indifference. Love argues that Brown lied in response to his grievances because she stated that Love was being treated according to the specialist, and he was non-compliant with the mesalamine enemas (Doc. 144, p. 37). But Brown relied on the medical records and the fact that Love was receiving care (Doc. 141-3, p. 1). While Brown was the healthcare unit administrator, she was not Love's direct treatment provider and could only advise him to see medical staff for his medical needs (*Id.* at pp. 1-2). Love argues that in reviewing the medical records, Brown should have looked deeper into the records and determined that Love had already been through the required rounds of mesalamine enemas as suggested by Dr. Bozdech and was ready for a different medication. But the fact that she did not draw those conclusions from the review of medical records is, at most, negligence and not deliberate indifference. *See Hayes*, 546 F.3d at 527 (failure to investigate further after receiving reviews from treating medical personnel was, at worst, negligence and not deliberate indifference). There is no evidence that she lied in responding to the grievances as Love suggests or that she acted with deliberate indifference.

Thus, Brown, Warden Love, and Thompson are entitled to summary judgment.

## CONCLUSION

For the reasons stated above, summary judgment is **GRANTED** as to Christine Brown, Warden Larue Love, and Christopher Thompson (Docs. 140, 141, 143). Summary judgment is also **GRANTED** as to Wexford Health Sources, Inc., but is **DENIED** as to Dr. Percy Myers (Docs. 128, 129). Because Love still seeks injunctive relief as to his medical care, Rob Jeffreys (in his official capacity only) will also remain in the case for purposes of implementing any injunctive relief awarded.

This case is now ready for trial. Love last requested the recruitment of counsel during the discovery phase (Doc. 124). At the time, the Court found that Love was capable of proceeding with discovery without the assistance of counsel (Doc. 126). Now that the case is ready for trial, Love, if he so chooses, may renew his request for counsel in order to assist him with trial matters.

The Court will set a status conference by separate notice to discuss a trial date.

**IT IS SO ORDERED.**

DATED:   March 29, 2022

*[signature]*
_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**